Michael R. Lozeau (State Bar No. 142893)
Rebecca L. Davis (State Bar No. 271662)
E-mail: michael@lozeaudrury.com
          rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Attorneys for Plaintiff
COMMUNITIES FOR A BETTER ENVIRONMENT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITIES FOR A BETTER ENVIRONMENT, a non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>PRAXAIR, INC., a Delaware corporation,<br><br>        Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMMUNITIES FOR A BETTER ENVIRONMENT ("CBE"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions

of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On March 18, 2019, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CBE's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

COMPLAINT

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 2300 E. Pacific Coast Highway in Wilmington, California ("Facility").  These discharges are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.      Los Angeles area waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species.  Storm water and non-storm water contaminated with sediment,

COMPLAINT

3

heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities.  The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges.  Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

8.    Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

III.   **PARTIES**

9.    Plaintiff CBE is an environmental justice organization organized under the laws of the State of California with a local office in Wilmington, California.  CBE has approximately 6,000 members who live, recreate and work in and around waters of the State of California, including the Los Angeles Harbor and San Pedro Bay.  Many of its members live and/or recreate in and around Los Angeles County.  CBE is dedicated to empowering low-income communities of color that seek a voice in determining the health of their air, water and land.  To further these goals, CBE actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions.

10.    CBE has members living in the communities near the Facility and the

COMPLAINT

4

Dominguez Channel Watershed.  They enjoy using the Dominguez Channel Watershed for recreation and other activities.  CBE members use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CBE use those areas to recreate and view wildlife, among other activities.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CBE's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11.    CBE brings this action on behalf of its members.  CBE's interest in reducing Defendant's discharges of pollutants into the Dominguez Channel Watershed and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CBE.

12.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

13.    Defendant PRAXAIR, INC. ("Praxair") is a Delaware corporation that owns and/or operates the Facility.

//

//

COMPLAINT

5

## IV.   <u>STATUTORY BACKGROUND</u>

**Clean Water Act**

14.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

16.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2.  The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.  The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

COMPLAINT

17.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

18.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains, or makes more stringent, the requirements of the 1997 Permit.

19.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

20.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the

COMPLAINT

1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

21.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

22.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of

COMPLAINT

pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* 1997 Permit, § A(2); 2015 Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. 1997 Permit, §§ A(9), (10); 2015 Permit, § X(B). Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. 2015 Permit, Fact Sheet § I(1).

23.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the

COMPLAINT

9

2015 Permit's technology-based effluent limitations and receiving water limitations. *See* 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  *See* 2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

24.    The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  *See* 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  *See* 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of

COMPLAINT

the 2015 Permit. *Id*. The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table. *See* 2015 Permit, § X(H)(4), (5).

25. The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP") (previously known as the Monitoring and Reporting Program). The primary objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. The 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. *See* 1997 Permit, § B(5). The 2015 Permit mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year. *See* 2015 Permit, §§ XI(B)(2), (3).

26. Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 Permit, § B(5)(c)(ii). Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters

COMPLAINT

11

identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

27.     Under the 2015 Permit, a facility must analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix." 2015 Permit, § XI(B)(6)(d).

28.     Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. 1997 Permit, § B(7); 2015 Permit, § XI.A.

29.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

30.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board. This requirement is continued with the 2015 Permit. Fact Sheet, Paragraph O.

31.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report"). 1997 Permit, § B(14). As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or

COMPLAINT

whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  *See* 2015 Permit, § XV.

32.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plan**

33.     The Regional Board has identified beneficial uses and established water quality standards for the Dominguez Channel and the San Pedro Bay in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

34.     The beneficial uses of these waters include, among others, municipal and domestic supply, groundwater recharge, water contact recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, wetland habitat, marine habitat, rare, threatened, or endangered species, preservation of biological habitats, migration of aquatic organisms, spawning, reproduction, and/or early development, and shellfish harvesting.  Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving

COMPLAINT

contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

35.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

36.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

37.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

38.     The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

39.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."

40.     The Basin Plan provides that "[w]aters shall be free of changes in

COMPLAINT

14

turbidity that cause nuisance or adversely affect beneficial uses."

41.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

42.     The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

43.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

44.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; chemical oxygen demand ("COD") – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; and nitrate + nitrite as nitrogen ("N+N").  Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

45.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived

from these benchmarks.  The 2015 Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; COD – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; and N+N – 0.68 mg/L.  An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30. The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

46.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen

COMPLAINT

16

enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $52,414 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011, up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.   STATEMENT OF FACTS

47.   Defendant owns and/or operates the Facility, a bulk atmospheric gas products plant located in Wilmington, CA.

48.   The Facility falls within Standard Industrial Classification ("SIC") Code 2813.

49.   The Facility covers approximately 9.1 acres of land.

50.   Based on CBE's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and CBE's information and belief, storm water is collected and discharged from the Facility via at least one storm water discharge locations.  Storm water discharged from the Facility flows into Dominguez Channel, which connects to Los Angeles Harbor in the East Basin of the Port of Los Angeles in San Pedro Bay on the Pacific Ocean (collectively, "Facility Receiving Waters").

51.   Information available to Plaintiff indicates that the Facility Receiving

COMPLAINT

Waters are waters of the United States.

52.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur including activities associated with the production of bulk atmospheric gas products.  This includes operation and maintenance, including lubrication, of production equipment including gas compressors, pumps, turbines, and cooling towers; loading and unloading of trucks and trailers; truck and equipment fueling and maintenance; operation and maintenance of an oily water separator; and equipment painting, among other activities.

53.     Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects metals, pH-altering substances, and other pollutants as it flows towards the storm water discharge location.

54.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

55.     On information and belief, CBE alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact

COMPLAINT

with exposed areas of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

56. Since at least June 17, 2014, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were reported in the Facility's Annual Reports submitted to the Regional Board or in reports submitted to the State Board via the Stormwater Multiple Application and Report Tracking System ("SMARTS"). Defendant certified each of those reports pursuant to the General Permit.

57. In Annual Reports and storm water sampling results submitted to the Regional Board and State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

58. The Facility has reported numerous discharges in excess of numeric water quality standards established in the Basin Plan. These observations have thus violated numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

59. The Facility has reported numerous discharges outside the range of the numeric water quality standard for pH of 6.5 – 8.5 established in the Basin Plan.

COMPLAINT

19

Defendant analyzed storm water discharges with a pH level below 6.5 on the following dates: February 27, 2018; December 13, 2015; March 2, 2015; and April 1, 2014.

60. The levels of pH in storm water detected at the Facility have been below the benchmark value and annual NAL for pH of 6.0 – 9.0 s.u. established by EPA and the State Board, respectively. Defendant analyzed storm water discharged from the Facility with a pH less than 6.0 s.u. on the following dates: December 13, 2015; March 2, 2015; and April 1, 2014.

61. The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively. For example, on January 5, 2016, the level of iron measured by Defendant at one of the Facility's storm water outfalls was 3.66 mg/L. That level of iron is more than three times the benchmark value and annual NAL for iron. Defendant also measured levels of iron in storm water discharged from the Facility in excess of 1 mg/L on January 15, 2019; November 29, 2018, October 13, 2018; February 27, 2018; January 9, 2018; January 5, 2017; December 30, 2016; January 5, 2016; December 13, 2015; March 2, 2015; December 12, 2014; and November 20, 2014.

62. The levels of N+N in storm water detected by the Facility have exceeded the benchmark value and annual NAL for N+N of 0.68 mg/L established by EPA and the State Board, respectively. For example, on February 27, 2018, the level of N+N measured by Defendant at one of the Facility's storm water outfalls was 5.8 mg/L.

COMPLAINT

That level of N+N is more than eight times the benchmark value and annual NAL for N+N.  Defendant also measured levels of N+N in storm water discharged from the Facility in excess of 0.68 mg/L on January 5, 2017; December 30, 2016; January 5, 2016; December 13, 2015; and November 30, 2014.

63.     The levels of aluminum in storm water detected by the Facility has exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on January 5, 2016, the level of aluminum measured by Defendant at one of the Facility's storm water outfalls was 2.5 mg/L.  That level of aluminum is more than three times the benchmark value and annual NAL for aluminum.  Defendant also measures levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on January 15, 2019; November 29, 2018; October 13, 2018; February 27, 2018; January 9, 2018; January 5, 2017; December 30, 2016; December 13, 2015; March 2, 2015; December 12, 2014; and November 30, 2014.

64.     On information and belief, CBE alleges that during both the first and second half of the 2016-2017 reporting year, Praxair failed to collect and analyze storm water samples at the Facility from the two required storm water sampling events.

65.     On information and belief, CBE alleges that storm water discharges occurred from the Facility on the following dates:  October 17, 2016; November 20 and 21, 2016; November 26 and 27, 2019; December 15 and 16, 2016; December 21, 23, and 23, 2016; December 30, 2016; January 9, 10, 11, and 12, 2017; January 19

COMPLAINT

and 20, 2017; January 22, 2017; February 3, 2017; February 6 and 7, 2017; February 10, 2017; February 17, 2017; April 8, 2017; and May 7, 2017.

66.     On information and belief, CBE alleges that Defendant has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Facility.

67.     On information and belief, Plaintiff alleges that since at least June 17, 2014, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, aluminum, iron, N+N, and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

68.     On information and belief, Plaintiff alleges that since at least June 17, 2014, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the

COMPLAINT

22

Facility because they do not reflect best industry practice considering BAT/BCT. According to information available to CBE, the Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

69.    On information and belief, CBE alleges that since at least June 17, 2014, the Facility's SWPPP map has failed to comply with the requirements of Section X(E) of the 2015 Permit.  The SWPPP map fails to indicate where materials are directly exposed to precipitation and fails to identify all areas of industrial activity.  CBE alleges that the SWPPP fails to identify where the minimum BMPs in different areas of the Facility will not adequately reduce the pollutants in the Facility's storm water discharges and to identify advanced BMPs for those areas.

70.    Information available to CBE indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into Dominguez Channel, which ultimately flows to the Pacific Ocean via Los Angeles Harbor in the East Basin of the Port of Los Angeles in San Pedro Bay.

71.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

72.    Information available to Plaintiff indicates that Defendant has not

COMPLAINT

23

fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

73.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

74.    The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for their discharges of pH, aluminum, iron, N+N, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

75.    Each day since June 17, 2014, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

76.    Defendant has been in violation of the BAT/BCT requirements every day

COMPLAINT

24

since June 17, 2014.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

77.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

78.     Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

79.     Plaintiff is informed and believes, and thereupon alleges, that since at least June 17, 2014, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for iron, aluminum, N+N, and pH

COMPLAINT

25

in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

80.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with iron, aluminum, N+N, pH-altering substances, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water from the Facility flows untreated into channels that empty into Dominguez Channel, which ultimately flows to the Pacific Ocean via Los Angeles Harbor in the East Basin of the Port of Los Angeles in San Pedro Bay.

81.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

82.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

83.     Every day since at least June 17, 2014, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

COMPLAINT

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

84.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

85.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

86.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

87.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

88.     Each day since June 17, 2014, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

89.     Defendant has been in violation of the Permit's SWPPP requirements every day since June 17, 2014.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

COMPLAINT

27

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring Implementation Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

90.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

91.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

92.     Defendant has failed to develop and implement an adequate MIP for the Facility.

93.     Defendant's ongoing failure to develop and implement an adequate MIP program is evidenced by, *inter alia*, its failure to collect and analyze samples from all storm water discharges at the Facility.

94.     Each day since at least June 17, 2014, that Defendant has failed to develop and implement an adequate MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VI.     RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

COMPLAINT

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.   Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendant to prepare a SWPPP for the Facility consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including

COMPLAINT

29

November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

        j.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

        k.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

        l.  Award any such other and further relief as this Court may deem appropriate.

Dated: June 17, 2019        Respectfully submitted,


By:    */s/ Rebecca L. Davis*_____
        Rebecca L. Davis
        LOZEAU DRURY LLP
        Attorneys for Communities for a Better Environment

COMPLAINT